**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 25-cv-23367-GAYLES/LOUIS**

NABIL HASCHEMIE,
FRANCISCO JAVIER BARBERI,
ALEX KATZ,
JEFFREY SCHNEIDER,
BRYAN ARMBRUSTER,
SAMUEL GEMUS,
JUSTIN FRANK HARKNESS,
LEO SUAREZ, and
JONATHAN MCDONALD,

      Plaintiffs,

v.

DIAGEO NORTH AMERICA, INC.,
DIAGEO BEER COMPANY USA, and
DIAGEO AMERICAS, INC.,

      Defendants.

_____/

**<u>DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT</u>**

# TABLE OF CONTENTS

*Page*

PRELIMINARY STATEMENT ................................................................................................ 1

BACKGROUND ...................................................................................................................... 6

    A.    Diageo's Tequila Making Process Is Tightly Controlled and Highly
Regulated .......................................................................................................... 6

    B.    The New York Action Leads to This Copycat Action ........................................... 9

ARGUMENT ......................................................................................................................... 12

I.    PLAINTIFFS LACK ARTICLE III STANDING ......................................................... 12

    A.    Plaintiffs Have Not Alleged A Particularized Injury-In-Fact .............................. 12

    B.    Plaintiffs Lack Standing To Assert Nationwide Common Law Claims ............... 16

    C.    Plaintiffs Lack Standing To Seek Injunctive or Declaratory Relief .................... 18

II.    PLAINTIFFS' ALLEGATIONS FAIL TO STATE A CLAIM ...................................... 19

    A.    Plaintiffs Fail to Allege False and Misleading Representations ......................... 19

        1.    Rule 9(b) Requires Particularity, Not Conjecture .................................... 21

        2.    Plaintiffs' Own Allegations Undermine Their Theory ............................. 22

        3.    The Alleged Testing Method Is Not Reliable for Tequila Testing .......... 25

        4.    Isolated, Unverified Data Cannot Support Plaintiffs' Sweeping
Allegations ............................................................................................. 26

    B.    Plaintiffs' Claims Are Barred By Safe Harbors Protecting Conduct That
Complies With Federal Law .............................................................................. 27

    C.    The Amended Complaint Is an Impermissible Shotgun Pleading ....................... 31

    D.    Plaintiffs' Unjust Enrichment Claims Are Duplicative and Legally Deficient .... 32

III.    THE COURT LACKS PERSONAL JURISDICTION OVER THE NON-
FLORIDA PLAINTIFFS' CLAIMS ............................................................................ 33

    A.    Florida's Long-Arm Statute Does Not Confer Jurisdiction ................................. 33

    B.    Exercising Jurisdiction Would Violate Due Process ........................................... 35

CONCLUSION ...................................................................................................................... 35

# TABLE OF AUTHORITIES

*Page(s)*

**CASES**

*Aetna v. Insys Therapeutics,*
  324 F. Supp. 3d 541 (E.D. Pa. 2018) ..................................................................... 18

*Aliano v. Fifth Generation,*
  2015 WL 5675423 (N.D. Ill. Sept. 24, 2015) ......................................................... 30

*Aliano v. WhistlePig,*
  2015 WL 2399354 (N.D. Ill. May 18, 2015) ........................................................... 31

*Alvarez v. Chevron Corp.,*
  656 F.3d 925 (9th Cir. 2011) ................................................................................... 28

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009) ................................................................................................. 27

*Astiana v. Hain Celestial Grp.,*
  783 F.3d 753 (9th Cir. 2015) ................................................................................... 32

*Atari Interactive v. State Farm Mut. Auto. Ins.,*
  2024 WL 4343050 (N.D. Tex. Sept. 27, 2024) ....................................................... 32

*Baloco ex rel. Tapia v. Drummond,*
  640 F.3d 1338 (11th Cir. 2011) ................................................................................. 6

*Barmapov v. Amuial,*
  986 F.3d 1321 (11th Cir. 2021) ............................................................................... 32

*Barnes v. KOS,*
  2025 WL 1928027 (S.D.N.Y. July 14, 2025) ................................................. *passim*

*Barron v. Snyder's-Lance,*
  2015 WL 11182066 (S.D. Fla. Mar. 20, 2015) ....................................................... 18

*Barton v. Procter & Gamble,*
  766 F. Supp. 3d 1045 (S.D. Cal. 2025) ............................................................. 22, 26

*Beale v. Biomet,*
  492 F. Supp. 2d 1360 (S.D. Fla. 2007) ................................................................... 20

*Bell v. Publix Super Mkts.,*
  982 F.3d 468 (7th Cir. 2020) ................................................................................... 19

*Bermudez v. Colgate-Palmolive*,
    667 F. Supp. 3d 24 (S.D.N.Y. 2023) ........................................................................ 24

*Biczo v. Ferrara Candy*,
    2023 WL 2572384 (N.D. Ill. Mar. 20, 2023) ........................................................... 20

*BMW Med. v. XON Holdings*,
    2016 WL 1268305 (W.D. La. Mar. 30, 2016) .......................................................... 20

*Bristol-Myers Squibb v. Superior Ct. of Cal.*,
    582 U.S. 255 (2017) .................................................................................................. 34

*Brown v. Coty*,
    2024 WL 894965 (S.D.N.Y. Mar. 1, 2024) .............................................................. 15

*Brown v. J.P. Turner & Co.*,
    2011 WL 1882522 (N.D. Ga. May 17, 2011) ........................................................... 20

*Cargill v. Degesch Am.*,
    875 F. Supp. 2d 667 (E.D. La. 2012) ...................................................................... 19

*Carmouche v. Tamborlee Mgmt.*,
    789 F.3d 1201 (11th Cir. 2015) ............................................................................... 33

*Carpenter v. PetSmart*,
    441 F. Supp. 3d 1028 (S.D. Cal. 2020) ................................................................... 17

*Carter v. Ford Motor Co.*,
    2021 WL 1165248 (S.D. Fla. Mar. 26, 2021) .................................................... 34, 35

*Cascio v. Johnson & Johnson*,
    2024 WL 693489 (N.D. Ga. Feb. 20, 2024) ............................................................ 26

*Celsius Holdings v. A SHOC Beverages*,
    2025 WL 2887300 (11th Cir. Oct. 10, 2025) ........................................................... 25

*Chaga v. Simons Agency*,
    2023 WL 2188699 (E.D. Pa. Feb. 23, 2023) ........................................................... 20

*Complete Logistical Servs. v. Rulh*,
    2018 WL 4101823 (E.D. La. Aug. 21, 2018) .......................................................... 32

*Cordoba v. DIRECTV*,
    942 F.3d 1259 (11th Cir. 2019) ............................................................................... 12

*Crosswell v. Martinez*,
   120 F.4th 177 (5th Cir. 2024) ................................................................................. 19

*Cruz v. Anheuser-Busch*,
   2015 WL 3561536 (C.D. Cal. June 3, 2015) ............................................................ 30

*Ctr. for Individual Rts. v. Chevaldina*,
   2017 WL 11682278 (S.D. Fla. Nov. 14, 2017) ......................................................... 22

*Daimler AG v. Bauman*,
   571 U.S. 117 (2014) ............................................................................................ 33, 35

*Doss v. Gen. Mills*,
   2019 WL 7946028 (S.D. Fla. June 14, 2019) .......................................................... 13

*Eckler v. Wal-Mart Stores*,
   2012 WL 5382218 (S.D. Cal. Nov. 1, 2012) ............................................................ 24

*Ellison v. Postmaster Gen., U.S. Postal Serv.*,
   2022 WL 4726121 (11th Cir. Oct. 3, 2022) ............................................................... 6

*Evans v. Crowe & Mulvey*,
   2020 WL 2748484 (D. Haw. May 27, 2020) ............................................................ 33

*Fedance v. Harris*,
   1 F.4th 1278 (11th Cir. 2021) ................................................................................. 20

*Fla. Wildlife Fed'n v. S. Fla. Water Mgmt. Dist.*,
   647 F.3d 1296 (11th Cir. 2021) ............................................................................... 12

*Fleury v. Gen. Motors LLC*,
   654 F. Supp. 3d 724 (N.D. Ill. 2023) ...................................................................... 19

*Forrett v. Gourmet Nut, Inc.*,
   634 F. Supp. 3d 761 (N.D. Cal. 2022) .................................................................... 33

*Francis v. Mead Johnson & Co.*,
   2010 WL 5313540 (D. Colo. Dec. 17, 2010) ........................................................... 32

*Ganz v. Grifols Therapeutics*,
   688 F. Supp. 3d 1209 (S.D. Fla. 2023) ................................................................... 20

*Garland v. Kroger Co.*,
   2025 WL 474914 (S.D. Cal. Feb. 12, 2025) ............................................................ 22

*Garza v. Spectrum Brands Pet LLC*,
   760 F. Supp. 3d 1039 (E.D. Cal. 2024) ............................................................. 20

*Gilmer v. Bureau Veritas Commodities & Trade, Inc.*,
   2021 WL 3772137 (S.D. Fla. Apr. 20, 2021) ..................................................... 34

*Goldstein v. Johnson & Johnson*,
   2019 WL 289290 (S.D. Fla. Jan. 21, 2019) ....................................................... 34

*Gregg v. Ameriprise Fin.*,
   245 A.3d 637 (Pa. 2021) ................................................................................... 19

*Grodnick v. Johnson & Johnson*,
   2024 WL 5056411 (D.N.J. Dec. 10, 2024) ........................................................ 13

*Gudgel v. Clorox*,
   514 F. Supp. 3d 1177 (N.D. Cal. 2021) ....................................................... 19, 20

*Harris v. Kashi Sales*,
   609 F. Supp. 3d 633 (N.D. Ill. 2022) ................................................................ 20

*Hendley v. Am. Nat'l Fire Ins.*,
   842 F.2d 267 (11th Cir. 1988) .......................................................................... 21

*Hickey v. Nat'l Ass'n of Letter Carriers, AFL-CIO*,
   2020 WL 4733959 (D.Colo. Aug. 14, 2020) ..................................................... 20

*Ill. Nat. Ins. v. Nordic PCL Const.*,
   870 F. Supp. 2d 1015 (D. Haw. 2012) .............................................................. 19

*J.W. ex rel. Williams v. Birmingham Bd. of Educ.*,
   904 F.3d 1248 (11th Cir. 2018) ........................................................................ 18

*Jackson v. Anheuser-Busch InBev SA/NV*,
   2021 WL 3666312 (S.D. Fla. Aug. 18, 2021) ............................................... 29, 30

*Jackson v. Diageo N. Am. Inc.*,
   No. 25 Civ. 5654 (N.D. Cal. 2025) ..................................................................... 1

*Jenkins v. BAC Home Loan Servicing*,
   822 F. Supp. 2d 1369 (M.D. Ga. 2011) ............................................................. 19

*Jiaherb Inc. v. MTC Indus.*,
   2025 WL 2555514 (D.N.J. Sept. 5, 2025) ......................................................... 25

*Johnson v. AECOM Energy & Constr.*,
  2024 WL 5341716 (S.D. Fla. May 22, 2024) ...................................................... 32

*Karlinski v. Costco Wholesale Corp.*,
  616 F. Supp. 3d 753 (N.D. Ill. 2022) ................................................................. 18

*Kay v. Copper Cane*,
  549 F. Supp. 3d 1014 (N.D. Cal. 2021) .............................................................. 31

*Krystofiak v. BellRing Brands*,
  737 F. Supp. 3d 782 (N.D. Cal. 2024) ............................................................... 26

*Lewis v. Casey*,
  518 U.S. 343 (1996).......................................................................................... 12

*Lewis v. Mercedes-Benz USA*,
  530 F. Supp. 3d 1183 (S.D. Fla. 2021) ......................................................... 17, 34

*Louis Vuitton Malletier v. Mosseri*,
  736 F.3d 1339 (11th Cir. 2013) ........................................................................ 35

*Lurenz v. Coca-Cola*,
  2024 WL 2943834 (S.D.N.Y. June 10, 2024) ..................................................... 14

*Luxco v. Consejo Regulador Del Tequila, A.C.*,
  121 U.S.P.Q.2d 1477 (T.T.A.B. 2017) ................................................................. 8

*Maeda v. Pinnacle Foods*,
  390 F. Supp. 3d 1231 (D. Haw. 2019) ............................................................... 19

*Markoff v. Athena Cosms.*,
  764 F. Supp. 3d 733 (N.D. Ill. 2025) ................................................................ 18

*Marrache v. Bacardi U.S.A.*,
  17 F.4th 1084 (11th Cir. 2021) ............................................................ 19, 20, 33

*McClure v. Toyota Motor Corp.*,
  759 F. Supp. 3d 1333 (N.D. Ga. 2024) .............................................................. 32

*Meier ex rel. Meier v. Sun Int'l Hotels, Ltd.*,
  288 F.3d 1264 (11th Cir. 2002) ........................................................................ 35

*In re Monat Hair Care Prods. Mktg., Sales Pracs., & Prods. Liab. Litig.*,
  2019 WL 5423457 (S.D. Fla. Oct. 23, 2019)...................................................... 18

*Morrison v. Fam. Dollar Stores*,
    2025 WL 1368839 (S.D. Fla. May 5, 2025) ...................................................................... 12, 14

*Myers v. Wakefern Food Corp.*,
    2022 WL 603000 (S.D.N.Y. Mar. 1, 2022) .................................................................. 22

*N.K. Collins v. William Grant & Sons*,
    472 F. Supp. 3d 806 (D. Haw. 2020) ........................................................................ 20

*Nichols v. Wm. Wrigley Jr.*,
    2011 WL 181458 (S.D. Fla. Jan. 19, 2011) .............................................................. 20

*O'Hara v. Diageo-Guinness, USA*,
    306 F. Supp. 3d 441 (D. Mass. 2018) ........................................................................ 30

*Parker v. Perdue Foods*,
    2024 WL 3993855 (M.D. Ga. Aug. 29, 2024) ............................................................ 17

*Pels v. Keurig Dr. Pepper*,
    2019 WL 5813422 (N.D. Cal. Nov. 7, 2019) ............................................................ 14

*Perez v. Metabolife Int'l*,
    218 F.R.D. 262 (S.D. Fla. 2003) ................................................................................ 17

*Pierson v. Orlando Reg'l Healthcare Sys.*,
    451 F. App'x 862 (11th Cir. 2012) ............................................................................ 32

*Pierson v. Orlando Reg'l Healthcare Sys.*,
    619 F. Supp. 2d 1260 (M.D. Fla. 2009) .................................................................... 31

*Piescik v. CVS Pharmacy*,
    576 F. Supp. 3d 1125 (S.D. Fla. 2021) .................................................................... 18

*Pop v. Luli Fama.com*,
    145 F.4th 1285 (11th Cir. 2025) ................................................................................ 21

*Prado-Steiman ex rel. Prado v. Bush*,
    221 F.3d 1266 (11th Cir. 2000) ................................................................................ 12

*Pusateri, et al. v. Diageo N. Am., Inc.*,
    No. 25 Civ. 2482 (E.D.N.Y. 2025) .............................................................................. 1

*Pye v. Fifth Gen.*,
    2015 WL 5634600 (N.D. Fla. Sept. 23, 2015) ...................................................... 28, 30

*Reich v. Genzyme Corp.*,
　2015 WL 13236347 (D. Colo. Aug. 14, 2015) ........................................................ 20

*Renfro v. Champion Petfoods USA*,
　25 F.4th 1293 (10th Cir. 2022) ............................................................................. 19

*Santiful v. Wegmans Food Mkts.*,
　2022 WL 268955 (S.D.N.Y. Jan. 28, 2022) ............................................................ 22

*Schouest v. Medtronic*,
　92 F. Supp. 3d 606 (S.D. Tex. 2015) .................................................................... 20

*Snyder v. Green Rds. of Fla.*,
　430 F. Supp. 3d 1297 (S.D. Fla. 2020) .................................................................. 19

*Soto v. GNC Holdings*,
　2025 WL 662135 (N.D. Ill. Feb. 28, 2025) ................................................. 13, 14, 16

*Spector v. Mondelez Int'l*,
　2017 WL 4283711 (N.D. Ill. Sept. 27, 2017) ......................................................... 25

*Steel Media Grp. v. Lewis*,
　2023 WL 1413043 (S.D. Fla. Jan. 6, 2023) ............................................................ 33

*Steelers Keys v. High Tech Nat'l*,
　2020 WL 7197822 (S.D. Fla. Dec. 7, 2020) ........................................................... 35

*Story v. Heartland Payment Sys.*,
　461 F. Supp. 3d 1216 (M.D. Fla. 2020) ................................................................. 35

*Strickland v. Alexander*,
　772 F.3d 876 (11th Cir. 2014) ............................................................................. 18

*Sullivan v. Leor Energy*,
　600 F.3d 542 (5th Cir. 2010) .............................................................................. 20

*In re Takata Airbag Prods. Liab. Litig.*,
　2016 WL 1266609 (S.D. Fla. Mar. 11, 2016) ........................................................ 17

*Toback v. GNC Holdings*,
　2013 WL 5206103 (S.D. Fla. Sept. 13, 2013) ....................................................... 24

*Turnipseed v. Simply Orange Juice*,
　2022 WL 657413 (S.D.N.Y. Mar. 4, 2022) ........................................................... 24

*U.S. ex rel. Clausen v. Lab'y Corp.*,
   290 F.3d 1301 (11th Cir. 2002) ........................................................................ 21, 22

*Valle v. 3M*,
   647 F. Supp. 3d 1262 (N.D. Fla. 2022) ................................................................. 33

*Vess v. Ciba-Geigy Corp. USA*,
   317 F.3d 1097 (9th Cir. 2003) ................................................................................ 21

*Vibe Micro, Inc. v. Shabanets*,
   878 F.3d 1291 (11th Cir. 2015) .............................................................................. 31

*Villarreal v. R.J. Reynolds Tobacco*,
   839 F.3d 958 (11th Cir. 2016) ................................................................................ 20

*Waite v. All Acquisition Corp.*,
   901 F.3d 1307 (11th Cir. 2018) ........................................................................ 33, 35

*Wallace v. ConAgra Foods*,
   747 F.3d 1025 (8th Cir. 2014) ................................................................................ 14

*Weiland v. Palm Beach Cnty. Sheriff's Off.*,
   792 F.3d 1313 (11th Cir. 2015) .............................................................................. 31

*Weiss v. Gen. Motors*,
   418 F. Supp. 3d 1173 (S.D. Fla. 2019) ................................................................... 17

*Welk v. Beam Suntory Import*,
   124 F. Supp. 3d 1039 (S.D. Cal. 2015) ................................................................... 30

*Whitaker v. Herr Foods*,
   198 F. Supp. 3d 476 (E.D. Pa. 2016) ................................................................. 18, 20

*Worldspan Marine v. Comerica Bank*,
   2021 WL 5882006 (11th Cir. Dec. 13, 2021) .......................................................... 32

*Wirth v. Mars Inc.*,
   2016 WL 471234 (C.D. Cal. Feb. 5, 2016) .............................................................. 28

*In re Zantac Prods. Liab. Litig.*,
   546 F. Supp. 3d 1152 (S.D. Fla. 2021) ................................................................... 25

## RULES AND REGULATIONS

United States–Mexico–Canada Agreement ("USMCA") Art.3.C.2(3) ...................................... 29

*Norma Oficial Mexicana for Tequila* ("NOM") 4.1 ................................................................ 7, 9

NOM 5.1.1. .................................................................................................................. 6, 7, 28

NOM 6.1.1.1. ...................................................................................................................... 7

NOM 6.5.2.2. ...................................................................................................................... 6

27 U.S.C. § 205(e) ............................................................................................................. 29

27 C.F.R. § 5.3 .................................................................................................................. 29

27 C.F.R. § 5.24 .................................................................................................................. 9

27 C.F.R. § 5.25 ................................................................................................................ 29

27 C.F.R. § 5.30 ............................................................................................................. 9, 29

27 C.F.R. § 5.102 ................................................................................................................ 9

27 C.F.R. § 5.148 ........................................................................................................... 9, 29

27 C.F.R. § 13.21(a) .......................................................................................................... 29

815 Ill. Comp. Stat. § 505/10b(1) ..................................................................................... 28

Colo. Rev. Code § 6–1–106(1)(a) ...................................................................................... 28

Fla. Stat. § 501.212(a) ....................................................................................................... 28

Fla. Stat. § 48.193 ............................................................................................................. 33

Ga. Code Ann. § 10-1-396 ................................................................................................ 28

Fed. R. Civ. P. 8 .......................................................................................................... *passim*

Fed. R. Civ. P. 9(b) ..................................................................................................... *passim*

Fed. R. Civ. P. 12(b)(1) ................................................................................................. 1, 35

Fed. R. Civ. P. 12(b)(2) ................................................................................................. 1, 35

Fed. R. Civ. P. 12(b)(6) ............................................................................................... *passim*

Fed. R. Civ. P. 44.1 ............................................................................................................ 6

## OTHER AUTHORITIES

CRT, *Agroservices*,
    perma.cc/865T-E87Y .................................................................................................... 8

CRT, *Inspection Unit*,
    perma.cc/6NRE-VZS9 ................................................................................................... 8

CRT, *Laboratory*,
    perma.cc/Z9WF-CGM6 ................................................................................................ 8

Diageo Bar Acad*., Tequila: History and Production* (2024),
    perma.cc/Z4BG-GBBA .................................................................................................. 6

Diageo SEC Form 20-F .................................................................................................... 6

x

Felisa Rogers, *Is that really tequila you're buying? Allegations of corruption raise serious questions*, Mezcalistas (Jan. 13, 2025) ........................................................................ 8, 26, 28

Freddy Thomas, et al., *Improved Characterization of the Botanical Origin of Sugar by Carbon-13 SNIF-NMR Applied to Ethanol*, 58 J. AGRIC. FOOD CHEM. 11580 (2010)...... *passim*

Press Release, *Diageo completes acquisition of super-premium tequila Casamigos,* Diageo, (Aug. 15, 2017), https://perma.cc/9MS9-T44U ........................................................................ 14

TTB, *Distilled Spirits Labeling,* perma.cc/639M-777Y ........................................................................................................... 9

Pursuant to Rules 8, 9(b), 12(b)(1), 12(b)(2), and 12(b)(6) of the Federal Rules of Civil Procedure, Defendants Diageo North America, Inc. ("Diageo"), Diageo Americas, Inc., and Diageo Beer Company USA (together, "Defendants" or "Diageo") respectfully move to dismiss Plaintiffs' Amended Complaint (ECF 23 ("Amended Complaint," or "AC")).

## PRELIMINARY STATEMENT

Ten days after a nearly identical complaint was filed in the Eastern District of New York,[1] Plaintiffs' counsel—copying and pasting that case's baseless, threadbare allegations—filed this lawsuit. Their theory that Diageo's tequilas contain non-agave alcohol sources rests entirely on incomplete and vaguely described results from a single European company's "test" that has no scientifically proven or even demonstrated applicability to tequila. That unvalidated "test"— purportedly performed on *one* sample of Diageo's Casamigos and *one* sample of its Don Julio brand tequila, neither of which Plaintiffs themselves purchased—somehow proves, according to them, that every bottle of tequila Diageo has sold for decades was not, as the label states, "100% agave." Plaintiffs' claims are not only false, they are the definition of implausible.

Tellingly, Plaintiffs do not allege any flaw or vulnerability in Diageo's meticulous and rigorously monitored tequila-making process, any failure of internal controls, any disclosure, investigation, or judicial finding, nor any whistleblower—among the hundreds if not thousands of people involved in making Casamigos and Don Julio tequilas—to support their claims. They allege no issue with the products' appearance, packaging, consistency or taste. And none of the sources they cite even mentions Diageo or its products. But that does not stop them from disparaging the

---

[1] That case is *Pusateri, et al. v. Diageo N. Am., Inc.*, No. 25 Civ. 2482 (E.D.N.Y. 2025) ("New York Action"). Another copycat action was later filed in the Northern District of California, *Jackson v. Diageo N. Am. Inc.*, No. 25 Civ. 5654 (N.D. Cal. 2025) ("California Action").

credibility and careful work of everyone involved in making Diageo's tequilas based on some unproven "test" that someone else did of some other liquid that none of them purchased.

Diageo's Casamigos and Don Julio tequilas are made from 100% Blue Weber agave. From the moment agave is planted in the ground, through the growing and harvesting process, and during every step of Diageo's tightly controlled, state-of-the-art manufacturing process, the making of Diageo's tequilas is closely tracked and monitored, with every batch being comprehensively sampled, evaluated, and tested multiple times in multiple ways—not only by Diageo itself, but also by the Consejo Regulador del Tequila (the "Tequila Regulatory Council," or "CRT"). The CRT is the only entity authorized by the Mexican government to regulate and validate the authenticity of tequila, which it does by strictly enforcing the standards prescribed in the *Norma Oficial Mexicana for Tequila* ("NOM"), the detailed Mexican regulatory scheme that governs every stage of tequila production. Through its comprehensive system of oversight and controls, the CRT verifies compliance and certifies the accuracy of the "100% agave" label on every bottle of Casamigos and Don Julio brand tequila produced by Diageo.

The unimpeachable integrity of Diageo's tequilas is a point of pride shared by the hundreds of people who ensure that every bottle of Casamigos and Don Julio is made from 100% Blue Weber agave. They include agave farmers who use drones and satellite imagery to track each agave plant and its photosynthesis rates across its years-long maturation cycle. They include truck drivers who transport harvested agave piñas from the field to the distillery in carefully monitored vehicles. They include distillery employees who weigh and calculate the sugar content and estimate liquid yield of each batch of agave delivered, then cut and roast, mill, ferment, and distill the agave (twice), and age, blend and bottle it, all within a closed system and in strict accordance with the NOM. They include scientists who perform a battery of chemical, physical, and sensory tests at every stage of the production process. And they include independent CRT regulators, who manually

count individual agave plants as they are planted and issue "passports" after calculating the expected yield of each harvested batch, are on-site every day at Diageo's facilities, receive real-time reporting of the results of Diageo's tests, and conduct their own series of gas chromatography and other tests, confirming (among other things) that the sugar content and liquid yield are consistent with the many thousands of samples in its database. Diageo does not rely (as Plaintiffs attempt to do) on a single, scientifically unproven, post-production "test" to determine the agave content of its tequilas. Instead, Diageo relies on this robust, real-world version of multi-factor authentication that incorporates at least a dozen different layers of verification. From farm to shelf, Diageo's tequilas undergo one of the most careful, comprehensive, rigorous, and highly regulated production processes of any spirit in the world.

Plaintiffs' allegations to the contrary are facially implausible and deficiently pled. They essentially claim that the hundreds of people involved in the making of Casamigos and Don Julio brand tequilas—farmers, Diageo employees and scientists, independent government-authorized regulators, and others—are lying and complicit in a massive, years-long consumer deception. But they allege no basis for that extraordinary accusation, which is pure fiction. Instead, the Amended Complaint rests on the thinnest of reeds: a pair of purported "testing" allegations that are non-sensical and insufficient as a matter of law. Their theory is the equivalent of someone claiming the Earth is flat because he saw a "test" result somewhere that says his neighbor's backyard is level.

This implausibility is compounded by Plaintiffs' failure to plead even the most basic facts necessary to make their allegations credible. They attach no test results to the Amended Complaint. They do not say who performed the testing, how much of what liquid was tested, where the samples came from, whether they were sealed bottles from store shelves (or not), when the testing occurred, or what chain of custody—if any—was maintained. They invoke "SNIF-NMR" testing without understanding it and omit that the method has never been scientifically validated for determining

the alcohol source of tequila. They include only one of the three isotope values typically reported in SNIF-NMR test results (the $CH_2$ position), withholding the other two. They do not allege who facilitated the purported testing, or their motives. And, fatally, *nowhere do Plaintiffs allege that any bottle of Casamigos or Don Julio tequila that any of them actually purchased was ever tested by anyone, anywhere, at any time*.

Stripped of their implausible testing allegations, Plaintiffs' claims have nothing to support them. They unsuccessfully try to alchemize rumor into fraud, internet speculation into evidence, and conjecture into liability. But their Amended Complaint fails at every turn.

*First*, Plaintiffs lack standing to bring their claims because they fail to allege any injury in fact. They have not alleged, nor could they, that the products they purchased (for the most part, after the original complaint was filed) were the bottles that were purportedly tested, and they allege no colorable basis to extrapolate their insufficiently pled "test" results to their own purchases. Furthermore, Plaintiffs purport to, but cannot, bring state common law claims on behalf of a "nationwide" class, because common law claims vary state-to-state. Plaintiffs also lack standing to bring claims for injunctive or declaratory relief because now that they are aware of the alleged misrepresentation, they cannot claim to be harmed by it again in the future.

*Second*, Plaintiffs' "testing" allegations are implausible as a matter of law. Every cause of action in the Amended Complaint turns on the same defective premise: that Diageo's "100% agave" label is a misrepresentation when it is not. Plaintiffs do not—because they cannot—allege any deficiencies with Diageo's tightly controlled and highly-regulated, state-of-the-art manufacturing process, or even a whiff of any other kind of impropriety or misconduct. They rely solely on nonsensical and insufficiently pled "testing" allegations. But Plaintiffs' own allegations confirm that they could not have performed the tests they allege on any of the bottles they purchased. Seven of the nine Plaintiffs purchased Diageo tequila in August 2025—*months* after

this action was first filed and in some cases *just days* before they filed the Amended Complaint. Even if it were possible that they commissioned testing in the timeline alleged, Plaintiffs' own allegations show that many of them did not even purchase the same kind of tequila they allegedly tested, depriving their claims of any factual basis.

There are two possibilities. Either Plaintiffs did not conduct any testing of those tequilas— in which case they cannot plausibly allege any meaningful link between the purported test results and the bottles they purchased—or they did conduct testing on those bottles and the results were consistent with other tequilas made from 100% agave, in which case they are cherry picking their allegations and misleading the Court. But Plaintiffs' "testing" allegations are so threadbare, relying on a single testing method scientifically unproven for tequila, purportedly performed on two samples for which they report incomplete results (disclosing only one of three numbers needed to even begin to understand their results), that it is impossible to determine what they did, with whom, when, where and how. Either way, the Amended Complaint should be dismissed because it requires an inferential leap so speculative that courts confronted with similar pseudo-scientific gambits have justifiably refused to credit them.

In any event, Plaintiffs' claims are foreclosed by the safe harbor provisions built into the very statutes they invoke. Diageo's "100% agave" labeling fully complies with Mexico's NOM and U.S. law. These regulatory determinations are binding and carry the force of law, precluding any attempt to relitigate them under state consumer protection statutes.

Plaintiffs' claims also fail because they have used an impermissible shotgun pleading to allege them against newly-added Defendants Diageo Americas, Inc. and Diageo Beer Company USA, without making any allegations specific to those Defendants or the original Defendant, Diageo North America, Inc. And Plaintiffs' unjust enrichment claims also fail either because they are not permitted in the alternative, or because they are duplicative of the statutory claims.

*Finally*, the Court has personal jurisdiction over only the claims asserted by one Plaintiff—Nabil Haschemie. The other Plaintiffs allege claims that have no connection to Florida. They reside in eight different states, claim injuries that occurred entirely outside this forum, and invoke consumer protection statutes and common law claims that do not apply here. Those claims cannot survive. Florida's long-arm statute does not stretch nearly that far, and due process forbids it.

Having failed to adequately plead standing, any plausible claim, or even jurisdiction, Plaintiffs' Amended Complaint should be dismissed in its entirety.

## BACKGROUND[2]

### A.  Diageo's Tequila Making Process Is Tightly Controlled and Highly Regulated

Defendant Diageo North America, Inc.'s business is the "production, importing, marketing, and distribution of premium drinks," including its Casamigos and Don Julio brand tequila products. Diageo SEC Form 20-F at 172, 200. By retail sales value, Diageo is the largest producer of tequila in the world. *Id.* at 1, 4. Pursuant to the NOM, Diageo's production facilities in Mexico produce only tequila, no other spirits. NOM 6.5.2.2; Sainz Decl. ¶ 34.

Mexican law requires tequila producers to comply with the NOM's detailed standards. AC ¶¶ 40-51; Sainz Decl. ¶¶ 11-14, 22-42. The NOM permits only tequila that meets certain requirements to bear the category label "100% agave." NOM 5.1.1.; Sainz Decl. ¶¶ 14-15, 41. The tequila-making process involves several steps. *See Tequila: History and Production*, Diageo Bar Acad. (2024), perma.cc/Z4BG-GBBA ("Tequila History"). First, agave is planted in one of five

---

[2] Citations to "AC ¶ __" are to the Amended Complaint, and citations to "Ex. __" are to the exhibits attached to the Declaration of Timothy S. Martin ("Martin Decl."), which are public records subject to judicial notice. *Ellison v. Postmaster Gen., U.S. Postal Serv.*, 2022 WL 4726121, at *7 (11th Cir. Oct. 3, 2022). Citations to "Sainz Decl. ¶ __" are to the Declaration of Hugo López Coll, of Sainz Abogados, S.C. ("Sainz Decl."), which the Court may consider on a motion to dismiss pursuant to Federal Rule of Civil Procedure 44.1, *see Baloco ex rel. Tapia v. Drummond*, 640 F.3d 1338, 1350 n.13 (11th Cir. 2011), and citations to "NOM __" are to Exhibit 1 to the Sainz Declaration, which is also subject to judicial notice under Rule 44.1, *id.*

designated regions and then cultivated, typically for five to seven years. *Id.* Upon harvesting, the heart of the agave plant—the piña—is removed. *Id.* The piñas are then transported to a distillery and roasted to convert their starches to fermentable sugars. *Id.* After cooking, the softened piñas are shredded and juiced. *Id.* The extracted juice is then transferred to closed fermentation tanks, where yeast is added to convert the sugars into a low-alcohol liquid. *Id.* This step determines whether a tequila is considered "100% agave"—if all of the sugar in the "fermentation" is from Blue Weber agave and the fermentation liquid is not "enhanced with sugars," the resulting tequila qualifies for the "100% agave" label. NOM 5.1.1.; Sainz Decl. ¶ 14.

After fermentation, the liquid is distilled twice. *See* Tequila History. Then, depending on the type of tequila being produced, the distilled liquid is aged in oak barrels. *Id.* Often, the barrels used to age tequila have been previously used for other types of spirits, like bourbon. *Id.* The amount of time the tequila is aged determines its classification as a blanco (unaged), joven (young), reposado (aged at least two months), añejo (aged at least one year), or extra añejo (aged at least three years). Finally, the tequila is bottled. *Id.* Under the NOM, "100% agave" tequila may be combined with certain additives to enhance or ensure consistent taste, color, aroma, or mouthfeel, so long as the additives do not exceed prescribed limits. NOM 6.1.1.1. The NOM also permits "100% Agave" tequila to be combined with certain other mellowing ingredients (or "*abocantes*"), so long as *abocantes* do not make up more than 1% by weight before the tequila is bottled. *See* AC ¶ 41; NOM 4.1, 6.1.1.1. If a tequila does not meet the requirements for the "100% agave" label, it still qualifies as tequila if no more than 49% of its "total reducing sugars" come from a source other than Blue Weber Agave, but it cannot use the "100% agave" label. *See* AC ¶ 43.

The Mexican government has entrusted the CRT with verifying and certifying that tequila producers strictly follow the NOM standards. *Id.* ¶ 40; Sainz Decl. ¶¶ 16-21. The CRT is "the only body accredited and approved to evaluate the NOM." *Luxco v. Consejo Regulador Del Tequila,*

*A.C.*, 121 U.S.P.Q.2d 1477 (T.T.A.B. 2017); Sainz Decl. ¶¶ 16-21. The CRT tracks tequila during the entire manufacturing process, from plant to bottle, Sainz Decl. ¶¶ 21-42, making tequila "one of the most closely regulated spirits on the planet." Felisa Rogers, *Is that really tequila you're buying? Allegations of corruption raise serious questions*, Mezcalistas (Jan. 13, 2025), perma.cc/3JB4-HWUY (cited at AC ¶ 64) ("Mezcalistas Art."). As Plaintiffs' own sources acknowledge, the CRT has "implemented a stringent system of quality control" that "document[s] every single agave planted (including GPS coordinates)," involves "an inspector [in] every distillery," and requires every batch of tequila to be tested. *Id.*; *see also* Sainz Decl. ¶¶ 21-42.

From the farm in Mexico to the shelf in the United States, Diageo's tequila must pass the review of three different regulators. The first is the CRT, which monitors and certifies compliance with the NOM. Among other steps, the CRT registers and certifies each agave farm, tracks every agave plant that is grown and harvested, and verifies the number and weight of agaves used. Sainz Decl. ¶¶ 22-26; *see also* CRT, Agroservices, perma.cc/865T-E87Y. Before harvest, growers must notify the CRT and obtain an Agave Transfer Passport—a document that records key harvest data and authorizes the sale of agave to a certified distillery. *Id.* ¶ 26. Each Diageo distillery must also obtain annual certification from the CRT authorizing it to produce 100% agave tequila, *see id.* ¶ 28; which Diageo has received every year, *see, e.g.*, Exs. 1-2. Every batch of 100% agave tequila destined for export must also qualify for and receive a Certificate of Authenticity for Exports of Tequila ("CET"). *See* Sainz Decl. ¶¶ 37-42; *see, e.g.*, Exs. 3-4. Critically, throughout the production process, CRT inspectors take samples at multiple stages and perform laboratory testing to confirm compliance with the NOM. *See* Sainz Decl. ¶¶ 31-32, 35-36; *see also* CRT, Inspection Unit, perma.cc/6NRE-VZS9; CRT, Laboratory, perma.cc/Z9WF-CGM6.

In addition to the CRT's oversight, Diageo's tequila must also satisfy two layers of U.S. regulatory review before reaching consumers. First, Diageo must acquire from the Alcohol and

Tobacco Tax and Trade Bureau ("TTB") a Federal Basic Importer's Permit and a Certificate of Label Approval ("COLA"). TTB, *Distilled Spirits Labeling*, perma.cc/639M-777Y; *see, e.g.*, Exs. 5-6. To issue a COLA, after the CRT approves the label, the TTB reviews and certifies that the product is "tequila" as defined under Mexican law and the NOM, ensuring that every label accurately reflects its certified origin and composition. *See* 27 C.F.R. §§ 5.102, 5.148. Then, before any bottle may enter the country, U.S. Customs and Border Protection ("CBP") confirms that each shipment matches the CRT's Certificate of Authenticity for Exports of Tequila ("CET") and that the CRT-approved labels affixed to the bottles correspond to the TTB-approved COLA. *See* 27 C.F.R. §§ 5.24, 5.30(d). Only upon passing these inspections may the product lawfully enter the United States market. *Id.* §§ 1.20, 5.24.

### B.  The New York Action Leads to This Copycat Action

On May 5, 2025, a putative class action was filed in the Eastern District of New York, alleging that Diageo falsely markets its Casamigos and Don Julio brand tequilas as "100% agave." *See* Compl., New York Action, ECF 1. That case, like this one, offered no evidence of wrongdoing by Diageo. Instead, it relied on reports of unrest in Mexico's agave industry. During the pandemic, soaring demand for agave led to widespread overplanting; as that surplus reached maturity, prices collapsed, sparking protests, criticism of the Mexican government, complaints against the CRT, and generalized, unsubstantiated allegations of industry corruption. *Id.* ¶¶ 18-22. The New York complaint sought to transform those economic concerns into a claim that Diageo diluted its tequilas with non-agave sugars to reduce costs—even though the very sources they cite acknowledge that agave prices have collapsed. *Id.* The New York complaint did not include any purported test results or other allegations to support its meritless claims—only citations to a few blog posts that do not mention Diageo and a single conclusory allegation that unidentified testing "confirmed" that Don Julio and Casamigos tequilas "did not meet the regulatory requirements" for 100% agave. *Id.* ¶ 24.

On May 15, ten days after the New York Action was filed, Plaintiff Haschemie brought this copycat class action in Florida state court. *See* ECF 1-1 ("Original Compl."). Like the New York plaintiffs, Plaintiff Haschemie alleged that Diageo falsely and deceptively marketed Casamigos and Don Julio tequilas as "100% agave," *id*. ¶ 9, and asserted three virtually identical claims: (1) claims under Florida's Deceptive and Unfair Trade Practices Act ("FDUTPA"); (2) negligent misrepresentation; and (3) unjust enrichment, *id*. ¶¶ 69-104. Haschemie candidly acknowledged that his lawsuit was a "me too" filing: he alleged he only sued after learning of the New York Action's allegations, which he claimed prompted him to conduct unspecified "testing." *Id*. ¶ 50. On July 28, Diageo timely removed this action to this Court, and on August 8, Diageo moved to transfer it to the Eastern District of New York under the first-to-file rule. ECF 19.

On August 18, before responding to Diageo's then-pending motion to transfer, Plaintiffs filed the operative Amended Complaint, which added two new Defendants (Diageo Beer Company USA and Diageo Americas, Inc.), AC ¶¶ 33-34; eight new Plaintiffs from eight different states (Hawaii, Louisiana, Illinois, California, Colorado, Texas, Georgia, and Pennsylvania), *id*. ¶¶ 13-28; 10 new statutory consumer fraud claims, *id*. ¶¶ 108-314; and three common law claims on behalf of putative nationwide classes, *id.* ¶¶ 84-107.

In support of their claims, Plaintiffs point to a handful of blog posts describing the recent discontent among some agave growers, which include speculative, unsubstantiated statements from protesters that tequila producers are "mixing cane alcohol into tequila" that is then "sold as 100% agave." AC ¶¶ 53-54. None of these reports, however, even mentions Casamigos, Don Julio or Diageo, let alone suggests that Diageo has engaged in such conduct.

Plaintiffs also advance allegations concerning "testing" that was supposedly conducted. AC ¶¶ 55-62. They assert that they "commissioned Nuclear Magnetic Resonance NMR laboratory testing," which they describe as using carbon isotope ratio analysis to identify the plant source of

ethanol in spirits, including tequila. *Id*. ¶¶ 55-57. According to Plaintiffs, "[e]thanol made from Blue Weber agave, a CAM49 [*sic*, *see infra* n.12 and accompanying text] plant, displays a distinct isotop[ic] signature" compared to ethanol derived from other plants such as corn or sugarcane. *Id*. ¶ 57. Plaintiffs allege that when this analysis was performed on samples of two products, Casamigos Añejo and Don Julio Reposado, purchased from retail stores, the measured isotope values were -10.3‰ (± 0.5) for Casamigos Añejo and -11.6‰ (± 0.5) for Don Julio Reposado. *Id*. ¶ 59. They further allege that these results fall outside the typical range from 100% agave tequila (which they allege is -7.0‰ to -9.0‰) and closer to the range associated with $C_4$ plants such as corn or sugarcane (which they allege is -13.5‰). *Id*. ¶¶ 58-59. Based on these alleged results, Plaintiffs assert that the "entire range" of Casamigos and Don Julio brand tequilas are adulterated. *Id*. ¶ 60. They do not, however, provide further detail about the purported testing—for example, who conducted it, when or where it was performed, what volumes of liquid were tested, the chain of custody of the samples tested, or whether the liquid tested came from the bottles purchased by the Plaintiffs. Finally, although the Amended Complaint refers to various Mexican, U.S., and state regulations, *id*. ¶ 59, Plaintiffs do not explain which regulations were violated, or how.

Plaintiffs allege that they "paid premium prices for Casamigos Tequilas and Don Julio Tequilas . . . in reliance on Defendants' representations that the Products were created from 100% Blue Weber agave." *Id*. ¶ 9. And they allege that they "intend to purchase" Diageo's products again "once they understand" that Diageo's representations "are accurate." *Id.* ¶ 62.

Based on those allegations, Plaintiffs assert 15 claims against Diageo, including common law claims for negligence, negligent misrepresentation, and unjust enrichment on behalf of a putative nationwide class, as well as violations of state consumer protection statutes on behalf of putative statewide classes of purchasers in Florida, Hawaii, Louisiana, Illinois, California,

11

Colorado, Texas, Georgia, and Pennsylvania. *Id*. ¶¶ 84-314. They seek damages, a declaratory judgment, and injunctive relief. *Id.* at 64.

## ARGUMENT

### I.   PLAINTIFFS LACK ARTICLE III STANDING

The Amended Complaint must be dismissed because Plaintiffs have failed to plead the most basic constitutional requirement for proceeding in federal court: Article III standing. To establish standing, Plaintiffs must show (1) an injury in fact that is concrete, particularized, and actual or imminent; (2) a causal connection between the injury and the alleged conduct; and (3) a likelihood that the injury will be redressed by a favorable decision. *Fla. Wildlife Fed'n v. S. Fla. Water Mgmt. Dist.*, 647 F.3d 1296, 1302 (11th Cir. 2021). Standing must be established separately for each claim and each form of relief; it "is not dispensed in gross." *Lewis v. Casey*, 518 U.S. 343, 358 n.6 (1996); *see also Prado-Steiman ex rel. Prado v. Bush*, 221 F.3d 1266, 1279-80 (11th Cir. 2000) (at least one named class plaintiff must have standing for each claim); *Cordoba v. DIRECTV*, 942 F.3d 1259, 1273 (11th Cir. 2019) (same for "class subclaims"). As explained below, Plaintiffs fall short for three independent reasons: they allege no particularized injury tied to their own purchases, no basis to pursue nationwide claims under multiple states' laws, and no real or imminent risk of future harm sufficient to support injunctive relief.

### A.   Plaintiffs Have Not Alleged A Particularized Injury-In-Fact

To begin, Plaintiffs lack standing because they fail to allege any particularized injury. Plaintiffs must plausibly allege that "[they] *themselves* purchased adulterated products"—either by showing that their own bottles were affected or that adulteration was "so widespread that nearly all products [were] affected." *Morrison v. Fam. Dollar Stores*, 2025 WL 1368839, at *3-7 (S.D. Fla. May 5, 2025) (Strauss, M.J.) (emphasis added); *Barnes v. KOS*, 2025 WL 1928027, at *4 (S.D.N.Y. July 14, 2025) (same).

They do neither. When plaintiffs "rely on testing to support allegations of misbranding," the "direct route" to pleading injury is "to test their own purchases." *Barnes*, 2025 WL 1928027, at *4. Yet, Plaintiffs do not allege that they tested *any* of the bottles they purchased. They claim to have bought nine different Diageo tequila products over the past several years but never connected any of those purchased bottles to their purported testing. AC ¶¶ 11-27.

Instead, Plaintiffs vaguely assert that unidentified "tequila samples," supposedly "purchased from retail stores in the United States," were analyzed and somehow "confirmed that Plaintiffs purchased tequila from Diageo" that was not 100% agave. *Id.* ¶ 59. But that leap makes no sense: the Amended Complaint describes purported testing of only two Diageo products—Casamigos Añejo and Don Julio Reposado—yet at least four Plaintiffs (Barberi, Katz, Harkness, and Suarez) bought entirely different Diageo tequilas. *Id.* ¶¶ 13, 15, 23, 25 (Don Julio 70 Cristalino, Don Julio Blanco, Casamigos Cristalino, and Casamigos Blanco). In other words, they ask the Court to assume—without any factual basis—that results from two unidentified samples can be imputed to every other bottle of Diageo tequila, often from a different product line, that they purchased as far back as 2022, *id.* ¶ 11, and as recently as two days before filing the Amended Complaint, *id.* ¶ 23. The law demands more, and courts reject claims based on conjecture rather than a plausible factual connection between a plaintiff's own purchase and the alleged defect. *See, e.g.*, *Doss v. Gen. Mills*, 2019 WL 7946028, at *2-3 (S.D. Fla. June 14, 2019), *aff'd*, 816 F. App'x 312 (11th Cir. 2020) (no standing where plaintiff did not "allege that the Cheerios she herself bought actually contain[ed] any glyphosate—just that some Cheerios that [had] been tested [did]"); *Soto v. GNC Holdings*, 2025 WL 662135, at *3 (N.D. Ill. Feb. 28, 2025) ("[U]nadorned allegation that 'independent testing' conducted at an unspecified time in an unspecified manner identified a product defect does not satisfy the plausibility standard."); *Grodnick v. Johnson & Johnson*, 2024 WL 5056411, at *4 (D.N.J. Dec. 10, 2024) ("[W]ithout any allegations as to when the testing

13

occurred, it is impossible to assess whether it is plausible that the product Plaintiff purchased . . . was contaminated"); *Pels v. Keurig Dr. Pepper*, 2019 WL 5813422, at *5 (N.D. Cal. Nov. 7, 2019) (no standing where plaintiff failed to allege bottle of mineral water he purchased came from the same source as samples tested for arsenic); *Wallace v. ConAgra Foods*, 747 F.3d 1025, 1030-31 (8th Cir. 2014) ("Without any particularized reason to think the consumers' own packages of Hebrew National beef actually exhibited the alleged non-kosher defect, the consumers lack Article III standing.").[3] Plaintiffs' failure to connect the samples to their own purchases is dispositive. Without facts tying the alleged testing to their products, Article III standing cannot exist.

Having failed to credibly allege injury from their own purchases, to save their claims, Plaintiffs must plausibly allege that adulteration was so pervasive it affected all Diageo tequilas. *See Morrison*, 2025 WL 1368839, at *8; *see also Barnes*, 2025 WL 1928027, at *5; *Soto*, 2025 WL 662135, at *2. That requires "well-pleaded factual allegations 'explaining why a third party's analysis . . . can be reasonably extrapolated to the plaintiffs' individual purchase.'" *Soto*, 2025 WL 662135, at *2 (quoting *Lurenz v. Coca-Cola*, 2024 WL 2943834, at *3 (S.D.N.Y. June 10, 2024)). But Plaintiffs offer nothing of the sort. The Amended Complaint omits every detail necessary to assess the reliability or relevance of their purported testing. Plaintiffs do not say when the "tequila samples" were purchased, AC ¶ 59, "leaving the reader to speculate about whether days, months, or years intervened between the testing and [Plaintiffs'] purchases," *Soto*, 2025 WL 662135, at *3. They provide no "identifying information—such as SKU numbers or lot codes—that would indicate where the tested products were purchased or obtained," nor do they identify the laboratory, the tester's qualifications, or even the number of bottles tested. *Barnes*, 2025 WL 1928027, at *6.

---

[3] Even accepting Plaintiffs' allegations as true, it remains possible that Plaintiffs' purported testing was performed on a Casamigos sample produced before Diageo even acquired Casamigos in June 2017. *See* Press Release, *Diageo completes acquisition of super-premium tequila Casamigos*, Diageo, (Aug. 15, 2017), https://perma.cc/9MS9-T44U.

These omissions matter: without them, there is no way to determine what, if anything, the alleged results say about Diageo's tequilas. "[T]he Court cannot know if all tested [samples] tested positive . . . or if a single [sample] tested positive, while every other tested [sample] showed no signs" of adulteration. *Brown v. Coty*, 2024 WL 894965, at *4 (S.D.N.Y. Mar. 1, 2024).

Unable to plausibly show that their own purchases were affected, Plaintiffs instead ask the Court to extrapolate their two alleged test results to the "entire range" of Casamigos and Don Julio tequilas on the theory that "they are created from the same base spirit[s]." AC ¶ 60. That sweeping assumption finds no support in the pleadings or science.[4] The two results alleged here substantially differ from the results alleged by the New York plaintiffs for the very same products. *Compare id.* ¶ 59 ($\delta^{13}C(CH_2)$ values of -10.3‰ (± 0.5) for Casamigos Añejo and -11.6‰ (± 0.5) for Don Julio Reposado), *with* Am. Compl. ¶ 47, New York Action, ECF 23 ¶ 47 ($\delta^{13}C$ values of -13.4‰ for Casamigos Añejo and -10.5‰ for Don Julio Reposado).[5] To plausibly extrapolate isolated data points, Plaintiffs must allege a test that is both accurate and representative—yet their allegations show neither. They plead no facts to suggest that their results can be generalized across brands, product lines, and batches; rather, their "'sparse factual allegations' make it 'equally plausible'" that their isolated results were "false positive[s]," "an isolated incident of contamination," or ordinary organic variation attributable to any number of factors. *Barnes*, 2025 WL 1928027, at *4.

---

[4] Plaintiffs assert that Casamigos Blanco, AC ¶ 5, and Don Julio Blanco, AC ¶ 7, "serve[] as the foundation" for each of their respective product lines. But they never bothered to test either one. Instead, they extrapolate from two alleged results—on two entirely different expressions, Casamigos Añejo and Don Julio Reposado—to reach the sweeping conclusion that every bottle Diageo has ever sold is mislabeled. That inferential leap is untenable. The Amended Complaint contains no factual allegations suggesting that all variants share the same formulation, production process, or purported defect. Indeed, each expression—Añejo, Reposado, or otherwise—is a distinct product, and Plaintiffs fail to adequately allege that isolated results from two unverified tests can plausibly be generalized to the entire Casamigos and Don Julio lines.

[5] The New York Action's allegations have their own fatal issues, including mislabeling what they analyze as $CH_2$ values as "global" values, which SNIF-NMR also can provide.

Even Plaintiffs' sole cited study undermines their theory. It does not define an isotope range for ethanol derived from 100% agave, and Plaintiffs allege no other facts showing that their two values fall outside any recognized range.[6] *See* AC ¶¶ 55-58; *see also infra* Section II.A. Plaintiffs do not plausibly allege that their purported results are inconsistent with authentic agave-derived alcohol—let alone that "the entire range" of Diageo's tequilas were systematically and routinely mislabeled. AC ¶ 60. Plaintiffs' bare assertion that purported results from two samples "confirmed that Plaintiffs purchased tequila" that was not 100% agave, *id.* ¶ 59, is the definition of a conclusory allegation—speculation dressed up as science that cannot establish particularized injury.

Finally, all Plaintiffs other than Plaintiff Haschemie lack standing based on the timing of their purchases alone. Only Haschemie alleges a specific purchase made before the filing of the New York Action on May 5, 2025, which first made the alleged "adulteration" public. AC ¶ 11. Every other purchase specifically alleged occurred afterward, and most were made within the two weeks preceding the filing of the Amended Complaint. AC ¶¶ 13-27. Having bought Diageo's tequilas after the allegations were already public, and indeed, several months after this very lawsuit was filed, these Plaintiffs cannot plausibly claim that they were misled or suffered any injury from the challenged statements. As one court observed in rejecting nearly identical tactics, such plaintiffs are "'either very foolish or attempting to purchase a lawsuit.'" *Soto*, 2025 WL 662135, at \*3 (comparing date of testing to date of plaintiffs' purchase for merits analysis). Plaintiffs' attempt to manufacture standing through post-filing purchases should be rejected.

**B. Plaintiffs Lack Standing To Assert Nationwide Common Law Claims**

Plaintiffs also purport to assert nationwide common-law claims for negligence, negligent misrepresentation, and unjust enrichment. AC ¶¶ 84-107. But there is no such thing as a

---

[6] Freddy Thomas, et al., Improved Characterization of the Botanical Origin of Sugar by Carbon-13 SNIF-NMR Applied to Ethanol, 58 J. AGRIC. FOOD CHEM. 11580, 11583-84 (2010).

"nationwide" common law class. Plaintiffs cannot collapse 50 different state-law regimes—each with its own elements, defenses, and remedies—into a single cause of action. *See Lewis v. Mercedes-Benz USA*, 530 F. Supp. 3d 1183, 1204-05 (S.D. Fla. 2021) (a "nationwide" unjust enrichment claim "is, in reality, fifty unjust enrichment claims—one for each state"); *Parker v. Perdue Foods*, 2024 WL 3993855, at *9 (M.D. Ga. Aug. 29, 2024) (elements of negligent misrepresentation claims vary by state); *accord Carpenter v. PetSmart*, 441 F. Supp. 3d 1028, 1039 (S.D. Cal. 2020) (nationwide common-law claims amount to "fifty fraud by omission claims, fifty breach [of] implied warranty claims, and fifty unjust enrichment claims–one of each claim for each state"). Such claims "need to be brought," if at all, "on behalf of fifty state subclasses"—they cannot be packed into one "nationwide" cause of action. *Lewis*, 530 F. Supp. 3d at 1205.

Standing doctrine leads to the same conclusion. Because "a claim cannot be asserted on behalf of a class unless at least one named plaintiff has suffered the injury that gives rise to that claim, . . . named plaintiffs in class actions have, time and again, been prohibited from asserting claims under a state law other than that which the plaintiff's own claim arises." *Weiss v. Gen. Motors*, 418 F. Supp. 3d 1173, 1181 (S.D. Fla. 2019) (citation modified); *see also In re Takata Airbag Prods. Liab. Litig.*, 2016 WL 1266609, at *4 (S.D. Fla. Mar. 11, 2016) ("A named plaintiff lacks standing to assert legal claims on behalf of a putative class pursuant to state law under which the named plaintiff's own claims do not arise."); *Perez v. Metabolife Int'l*, 218 F.R.D. 262, 267-68 (S.D. Fla. 2003) (Florida plaintiffs lacked standing to assert claims under other states' laws).

Here, nine named Plaintiffs from nine states allege injuries under the laws of those jurisdictions. None can assert claims arising under the laws of the remaining 41 states that have no representative plaintiff. Plaintiff Haschemie is the only individual whose claims fall within this Court's personal jurisdiction (as shown below, *infra* Section III), and his allegations concern purchases in Florida alone. Accordingly, the Court should dismiss the common-law claims to the

extent they purport to proceed on behalf of a nationwide class, or under the laws of the 41 states that lack a named representative plaintiff.[7]

### C.  Plaintiffs Lack Standing To Seek Injunctive or Declaratory Relief

Plaintiffs' requests for prospective relief fail for a separate reason: their own allegations foreclose any plausible risk of future harm. A plaintiff has standing to seek injunctive relief "only if the party alleges . . . a real and immediate—as opposed to a merely conjectural or hypothetical— threat of *future* injury." *J.W. ex rel. Williams v. Birmingham Bd. of Educ.*, 904 F.3d 1248, 1264 (11th Cir. 2018). The same requirement applies to declaratory relief. *See Strickland v. Alexander*, 772 F.3d 876, 882-83 (11th Cir. 2014).

Courts therefore deny injunctive standing in consumer fraud cases once a plaintiff becomes aware of the alleged misrepresentation, because awareness itself precludes any real risk of being deceived again. *See, e.g.*, *In re Monat Hair Care Prods. Mktg., Sales Pracs., & Prods. Liab. Litig.*, 2019 WL 5423457, at *5 (S.D. Fla. Oct. 23, 2019) (Gayles, J.) (no standing where plaintiffs alleged they "would not have purchased the Products had they known of the harm"); *see also Piescik v. CVS Pharmacy*, 576 F. Supp. 3d 1125, 1131 (S.D. Fla. 2021) (no standing once plaintiff was "acutely aware" of label's meaning); *Barron v. Snyder's-Lance*, 2015 WL 11182066, at *11 (S.D. Fla. Mar. 20, 2015) (same). Plaintiffs expressly allege that they now know Diageo's tequilas are

---

[7] Some of Plaintiffs' negligence-based claims are also barred by the economic loss doctrine, which precludes recovery for purely economic damages unaccompanied by personal injury or property damage. This doctrine forecloses negligence and negligent misrepresentation claims under both Illinois and Pennsylvania law. *See Karlinski v. Costco Wholesale Corp.*, 616 F. Supp. 3d 753, 767 (N.D. Ill. 2022) (negligent misrepresentation claim failed where plaintiff alleged only economic loss); *Markoff v. Athena Cosms.*, 764 F. Supp. 3d 733, 746 (N.D. Ill. 2025) (economic-loss rule barred negligence and negligent misrepresentation claims); *Whitaker v. Herr Foods*, 198 F. Supp. 3d 476, 491 (E.D. Pa. 2016) (applying economic loss doctrine to negligent misrepresentation claim); *Aetna v. Insys Therapeutics*, 324 F. Supp. 3d 541, 557 (E.D. Pa. 2018) (same, barring negligence and negligent misrepresentation claims).

not "100% agave." AC ¶¶ 9-10. Having pled that knowledge, they cannot plausibly claim any

continuing risk of deception and thus lack standing to seek either injunctive or declaratory relief.

Nor can Plaintiffs create standing by alleging they "hope to purchase these products in the

future when they are truly 100% agave." *Id.* ¶ 10. That statement confirms the opposite: they will

not buy again unless something changes, foreclosing any imminent injury. Courts reject identical

allegations. *See Snyder v. Green Rds. of Fla.*, 430 F. Supp. 3d 1297, 1304 (S.D. Fla. 2020) (no

standing where plaintiffs will not repurchase while "the labelling does not meet their standards").

Because Plaintiffs are aware of the alleged misrepresentation, they face no imminent harm. Their

requests for injunctive and declaratory relief must therefore be dismissed.

## II.    PLAINTIFFS' ALLEGATIONS FAIL TO STATE A CLAIM

### A.    Plaintiffs Fail to Allege False and Misleading Representations

All of Plaintiffs' claims fail at the threshold because they never plausibly allege that

Diageo's regulator-approved statement—that its Casamigos and Don Julio tequilas are "100%

agave"—is false or misleading.

To state a statutory consumer protection claim, Plaintiffs must adequately allege an "unfair"

or "deceptive" act or practice, or a "misleading" statement or "misrepresentation." *See Bell v.

Publix Super Mkts.*, 982 F.3d 468, 475 (7th Cir. 2020) (noting such laws are "interpreted for the

most part interchangeably").[8] The same is true for their common-law negligence and negligent

misrepresentation claims, which turn on the allegation that Diageo made "misleading

---

[8] *See also Renfro v. Champion Petfoods USA*, 25 F.4th 1293, 1301 (10th Cir. 2022) (Colorado); *Marrache v. Bacardi U.S.A., Inc.*, 17 F.4th 1084, 1097 (11th Cir. 2021) (Florida); *Fleury v. Gen. Motors*, 654 F. Supp. 3d 724,731-32 (N.D. Ill. 2023) (Illinois); *Crosswell v. Martinez*, 120 F.4th 177, 188 (5th Cir. 2024) (Texas); *Gregg v. Ameriprise Fin.*, 245 A.3d 637, 646 (Pa. 2021) (Pennsylvania); *Jenkins v. BAC Home Loan Servicing*, 822 F. Supp. 2d 1369, 1375 (M.D. Ga. 2011) (Georgia); *Cargill v. Degesch Am.*, 875 F. Supp. 2d 667, 676 (E.D. La. 2012) (Louisiana); *Gudgel v. Clorox*, 514 F. Supp. 3d 1177, 1184 (N.D. Cal. 2021) (California); *Maeda v. Pinnacle Foods,* 390 F. Supp. 3d 1231, 1250-52 (D. Haw. 2019) (Hawaii).

representations," AC ¶ 88, or "misrepresentations of material facts," AC ¶ 96. *See Ganz v. Grifols Therapeutics*, 688 F. Supp. 3d 1209, 1226-27 (S.D. Fla. 2023); *Beale v. Biomet*, 492 F. Supp. 2d 1360, 1374 (S.D. Fla. 2007).[9] And the unjust enrichment claim likewise fails if the "100% agave" statement's falsity is inadequately pled. *Marrache*, 17 F.4th at 1102.[10]

Thus, all 15 causes of action rise or fall on a single premise: that Diageo falsely labels its tequilas as "100% agave." Yet the Amended Complaint offers no facts supporting that claim. They ask this Court to infer from threadbare allegations that Diageo has adulterated millions of bottles of tequila over many years.[11] That leap is implausible.

___

[9] In Hawaii, Texas, Georgia, Colorado, and Louisiana, Plaintiffs would have to plead that Diageo's label included "false information." *Ill. Nat. Ins. v. Nordic PCL Const.*, 870 F. Supp. 2d 1015, 1038 (D. Haw. 2012) (Hawaii); *Schouest v. Medtronic*, 92 F. Supp. 3d 606, 613 (S.D. Tex. 2015) (Texas); *Brown v. J.P. Turner & Co.*, 2011 WL 1882522, at *6 (N.D. Ga. May 17, 2011) (Georgia); *Hickey v. Nat'l Ass'n of Letter Carriers, AFL-CIO*, 2020 WL 4733959, at *5 (D. Colo. Aug. 14, 2020) (Colorado); *BMW Med. v. XON Holdings*, 2016 WL 1268305, at *5 (W.D. La. Mar. 30, 2016) (Louisiana). Florida, California, and Pennsylvania require allegations of a "misrepresentation of material fact." *Nichols v. Wm. Wrigley Jr.*, 2011 WL 181458, at *3 (S.D. Fla. Jan. 19, 2011) (Florida); *Gudgel*, 514 F. Supp. 3d at 1187 (California); *Chaga v. Simons Agency*, 2023 WL 2188699, at *3 (E.D. Pa. Feb. 23, 2023) (Pennsylvania). And Illinois requires allegations that Diageo "made a statement and was negligent in ascertaining the truth of that statement." *Harris v. Kashi Sales*, 609 F. Supp. 3d 633, 643 (N.D. Ill. 2022) (Illinois).

[10] *See also N.K. Collins v. William Grant & Sons*, 472 F. Supp. 3d 806, 833 (D. Haw. 2020); *Biczo v. Ferrara Candy*, 2023 WL 2572384, at *4 (N.D. Ill. Mar. 20, 2023); *Reich v. Genzyme Corp.*, 2015 WL 13236347, at *11 (D. Colo. Aug. 14, 2015), *adopted*, 2015 WL 5842418 (D. Colo. Oct. 7, 2015); *Sullivan v. Leor Energy*, 600 F.3d 542, 550 (5th Cir. 2010); *Whitaker*, 198 F. Supp. 3d at 491; *Garza v. Spectrum Brands Pet*, 760 F. Supp. 3d 1039, 1052 (E.D. Cal. 2024) (dismissing unjust enrichment claim for failure "to allege that any statements on the . . . label[s] were untrue").

[11] To be clear, although Plaintiffs attempt to toll the statute of limitations to increase the size of their putative classes, their tolling allegations are deficient. The conclusory allegation that Diageo "conceal[ed]" information and that they could not "reasonably have learned" of their claims until a January 13, 2025 article reported on a "peaceful protest by agave farmers," AC ¶¶ 63-66, does not adequately allege any affirmative act by Diageo that prevented them from discovering the facts underlying their claims. That failure is dispositive. *See Fedance v. Harris*, 1 F.4th 1278, 1287 (11th Cir. 2021) (fraudulent concealment requires "both successful concealment of the cause of action and fraudulent means to achieve that concealment"). Besides, Plaintiffs' theory makes no sense. If, as they claim, agave farmers knew enough to protest the alleged misconduct, then a diligent plaintiff had enough information to bring a lawsuit on the same theory. *See Villarreal v. R.J. Reynolds Tobacco*, 839 F.3d 958, 971 (11th Cir. 2016) ("[E]quitable tolling requires the party seeking tolling to prove . . . that he has been pursuing his rights diligently.").

*1.  Rule 9(b) Requires Particularity, Not Conjecture*

The defects in Plaintiffs' pleading are especially acute given that Rule 9(b)'s heightened standard governs every claim they assert. The Amended Complaint rests entirely on a single alleged course of deceptive conduct—Diageo's supposed misrepresentation that its tequilas are "100% agave." As the Eleventh Circuit recently reaffirmed, Rule 9(b) applies whenever a complaint "sounds in fraud," regardless of how the claims are styled. *Pop v. Luli Fama.com*, 145 F.4th 1285, 1293 (11th Cir. 2025) (citing *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1102 (9th Cir. 2003) (procedural Rule 9(b) applies to state claims)). An alleged "false representation of a material fact" falls squarely within the rule—where, as here, a complaint relies on an alleged "unified course of fraudulent conduct," its claims are "grounded in fraud." *Id.* at 1294-95.

Rule 9(b) requires particulars—the "who, what, when, where, and how" of the challenged misrepresentation. *Speier-Roche v. Volkswagen Grp. of Am., Inc.*, 2014 WL 1745050, at *7 (S.D. Fla. Apr. 30, 2010); *see also U.S. ex rel. Clausen v. Lab'y Corp.*, 290 F.3d 1301, 1310-11 (11th Cir. 2002). Complaints that "refuse[] to offer specifics" are routinely dismissed. *Hendley v. Am. Nat'l Fire Ins.*, 842 F.2d 267, 269 (11th Cir. 1988). This one offers none. Plaintiffs allege nothing about Diageo's production process—no facts showing who, what, when, where, or how any alleged adulteration could have occurred, nor how a scheme of such magnitude could exist undetected by agave growers and suppliers, distillery employees, scientists, independent regulators, and any of the hundreds of people involved in the manufacturing process. Instead, they base their entire Amended Complaint on two cryptic data points—a sample size that would not pass muster at a middle school science fair—and a conclusory assertion that "tequila samples purchased from retail stores in the United States" produced results "not in agreement with . . . 100% agave." AC ¶ 59. That threadbare allegation, unsupported by any specifics, falls far short of Rule 9(b)'s

requirements—it is "akin to a house built on top of quicksand." *Ctr. for Individual Rts. v. Chevaldina*, 2017 WL 11682278, at *4 (S.D. Fla. Nov. 14, 2017).

This lack of specificity is compounded by Plaintiffs' failure to provide even the most basic information about the purported testing on which they hang their claims. Merely asserting that "unidentified independent testing . . . produced reported results" does not satisfy Rule 9(b). *Barton v. Procter & Gamble*, 766 F. Supp. 3d 1045, 1061-62 (S.D. Cal. 2025) (dismissing claims where plaintiffs failed to identify "the laboratory that performed the testing," the "date of testing," or "details regarding the method of testing"); *see also Garland v. Kroger*, 2025 WL 474914, at *7 (S.D. Cal. Feb. 12, 2025) (testing allegations inadequate for failure to allege "the specific date or place of the testing, and who conducted the testing"). Plaintiffs do not attach the alleged test results or identify when and where the purported samples were obtained, who conducted the testing, what qualifications those individuals had, what they did and how they did it, or whether any chain of custody was maintained. AC ¶¶ 55-62. The failure to plead those basic facts is fatal to their claims—and would be even under Rule 8. *See Myers v. Wakefern Food Corp.*, 2022 WL 603000, at *4 (S.D.N.Y. Mar. 1, 2022) (testing allegations inadequate for failure to allege "the specific date, time, or place of the testing, who conducted the testing, the qualifications of the testers, etc."); *Santiful v. Wegmans Food Mkts.*, 2022 WL 268955, at *4 (S.D.N.Y. Jan. 28, 2022) (same). Plaintiffs instead ask this Court to credit the conclusions of an unidentified source, using an undisclosed method, on unspecified samples, under unknown conditions. But Rule 9(b) demands far more than blind trust in unexplained, unverified "results." *Lab'y Corp.*, 290 F.3d at 1310.

### 2. *Plaintiffs' Own Allegations Undermine Their Theory*

What little information Plaintiffs *do* include only underscores the implausibility of their testing claims. Their allegations regarding "Nuclear Magnetic Resonance" ("NMR") testing (which, based on the sole article they cite, AC ¶ 57, appears to be Site-Specific Natural Isotopic

Fractionation ("SNIF") NMR, a subtype of NMR testing) reveal a startling degree of unawareness. As but one example, Plaintiffs assert that NMR testing "identifies the plant of origin of ethanol . . . by measuring the natural carbon fingerprint," and that ethanol made from Blue Weber agave—a "CAM49" plant—"shows a distinct isotopic signature" from that of corn or sugarcane, which they label "$C_4$ plants." AC ¶¶ 56-57. But there is no such thing as a "CAM49" plant—that is a nonsense term that appears to have resulted from carelessly copying the California complaint, including its superscript notation for footnote 49. *See* ECF 28 at 13.[12]

Plaintiffs' typo may seem trivial, but it is emblematic of a larger problem. It lays bare what this case really is: not a careful effort to vindicate the rights of consumers, but a rushed, copycat pleading built on bad science and worse proofreading. This lack of rigor runs through the Amended Complaint—from asserting claims over which this Court has no jurisdiction, to indiscriminately lumping all Defendants together in a shotgun pleading, to parroting a mishmash of scientific-sounding jargon without the faintest understanding of what it means. As such, it is no surprise that the same sloppiness carries through to Plaintiffs' central theory—a nearly incoherent account of scientific testing that they plainly do not understand.

For example, Plaintiffs allege that their supposed testing of "tequila samples purchased from retail stores in the United States" produced $\delta^{13}C(CH_2)$ values of -10.3‰ (± 0.5) for Casamigos Añejo and -11.6‰ (± 0.5) for Don Julio Reposado.[13] AC ¶ 59. From there, they leap straight to the conclusion that these values are "not in agreement with the tested samples' description of 100% agave." *Id.* But they never "substantiate how exactly the alleged findings from the purported lab

---

[12] For the record, Agave is a CAM or Crassulacean Acid Metabolism plant. *See* Thomas, et al., 58 J. AGRIC. FOOD CHEM. at 11580-81.

[13] Plaintiffs actually plead $\delta^{13}C(CH_2)$ values of -10.3 (±0.5)<u>%</u> for Casamigos Añejo and -11.6 (±0.5)<u>%</u> for Don Julio Reposado. AC ¶ 59. The use of the percent sign (%), instead of the correct per mille (‰) symbol is yet another sign of Plaintiffs' carelessness and lack of scientific literacy.

test" lead to this conclusion, as they must. *Turnipseed v. Simply Orange Juice*, 2022 WL 657413, at *4 (S.D.N.Y. Mar. 4, 2022). Their only purported basis for their interpretation is an assertion that $\delta^{13}C(CH_2)$ values for "agave-derived ethanol" should fall between -7.0‰ and -9.0‰—a range they attribute to a 2010 study. AC ¶ 58.

But this is not what the study says. The Thomas et al. (2010) paper does *not* specify a -7.0‰ to -9.0‰ threshold for what constitutes "authentic" tequila, nor does it conclude that any sample outside that range must be adulterated with cane alcohol. And the authors did not rely on $\delta^{13}C(CH_2)$ values alone; they analyzed *both* the $\delta^{13}C(CH_2)$ *and* the $\delta^{13}C(CH_3)$ positions as a part of a multi-variable matrix to identify source patterns. Thomas, et al., 58 J. AGRIC. FOOD CHEM. at 11583-84 (CAM plants are distinguishable from $C_4$ plants "by [their] very strong impoverishment of the $CH_3$ site as compared to the $CH_2$ one"). Plaintiffs' decision to extract a single $\delta^{13}C(CH_2)$ data point and convert it into a stand-alone test for tequila authenticity is not merely unsupported by the study—it is flatly inconsistent with the SNIF-NMR methodology on which the study was based.

Courts routinely reject this kind of scientific gap-filling. Plaintiffs cannot cherry-pick data points, misread a study they do not understand, and then ask the Court to take their conclusions on faith. As courts in this District and others have made clear, a complaint that relies on scientific literature to allege deceptive marketing must show that the cited study actually shows that the challenged labeling was false. When it does not, the claim fails as a matter of law. *See Toback v. GNC Holdings*, 2013 WL 5206103, at *4 (S.D. Fla. Sept. 13, 2013) (studies addressing only two ingredients "fail[ed] to raise Plaintiff's claim, that the [product] as a whole [did] not function as advertised, above the speculative level"); *Bermudez v. Colgate-Palmolive*, 667 F. Supp. 3d 24, 37 (S.D.N.Y. 2023) (when "studies cited do not support [plaintiff's] claims, the plaintiff has not plausibly pleaded her claims"); *Eckler v. Wal-Mart Stores*, 2012 WL 5382218, at *6-7 (S.D. Cal. Nov. 1, 2012) (dismissing claims where cited studies did not actually "examin[e] the effectiveness

of the actual [p]roduct" at issue); *Spector v. Mondelez Int'l*, 2017 WL 4283711, at *7 (N.D. Ill. Sept. 27, 2017) (statements about other products insufficient).[14]

If Plaintiffs' position is that the Court should draw scientific inferences from their sole study, they were required to "allege this with greater clarity" so that both the Court and Defendants can understand the basis of their theory. *In re Zantac Prods. Liab. Litig.*, 546 F. Supp. 3d 1152, 1172-73 (S.D. Fla. 2021) (granting motion to dismiss where plaintiffs attached studies but failed to "clearly argue and explain" how those studies supported their claims). Plaintiffs have not done so. They provide no factual or scientific foundation for their numerical range of what constitutes "authentic" tequila, leaving only two unexplained data points that—even if accepted as accurate— mean nothing without context. *Id.* at 1174-75 (plaintiffs "must provide context and explanation").

### 3. The Alleged Testing Method Is Not Reliable for Tequila Testing

Even setting aside Plaintiffs' misreading of the science, the SNIF-NMR method they invoke is not an accepted or validated test for tequila authenticity. It has never been adopted by the tequila industry, endorsed by any regulator (including the CRT), or recognized by any independent scientific authority for tequila testing. *Cf.* Sainz Decl. ¶ 36 (listing approved testing methods and noting that SNIF-NMR "is not contemplated by the regulations"). It is sold by a single company— Eurofins—the same entity that authored the lone study Plaintiffs cite. AC ¶¶ 57-59. No court has ever credited SNIF-NMR as a reliable tool for detecting tequila adulteration, and when similar attempts have been made in other industries, courts have rejected them as deviations from accepted standards. *Cf. Jiaherb v. MTC Indus.*, 2025 WL 2555514, at *16 (D.N.J. Sept. 5, 2025) (declining to credit plaintiff's reliance on NMR testing where it was not industry standard and not required

---

[14] The Eleventh Circuit recently affirmed that using scientific evidence in bad faith can warrant sanctions. *See Celsius Holdings v. A SHOC Beverages*, 2025 WL 2887300, at *3 (11th Cir. Oct. 10, 2025). Diageo reserves all rights to seek appropriate relief should the circumstances so warrant.

by relevant regulations). Even Plaintiffs' own sources concede that NMR testing can only "*potentially* confirm if tequila has been adulterated with cane alcohol." Mezcalistas Art. (emphasis added); *see also* Thomas, et al., 58 J. AGRIC. FOOD CHEM. at 11584 ("[T]his new method *could* become a new official standard for the control of authenticity of fruit juices and spirits." (emphasis added)).

### 4.   *Isolated, Unverified Data Cannot Support Plaintiffs' Sweeping Allegations*

Despite these fatal defects, Plaintiffs ask the Court to take yet another leap of faith and assume that two unexplained purported test results somehow condemn "the entire range" of Casamigos and Don Julio tequilas. AC ¶ 60. They ask the Court to treat their "tests" of just two products—Casamigos Añejo and Don Julio Reposado—as proof that every Casamigos and Don Julio tequila, spanning decades of production and dozens of distinct expressions, was adulterated.

Courts have consistently rejected this kind of speculation and refuse to infer product-wide falsity from a handful of isolated test results unmoored from the specific products tested. *See, e.g.*, *Cascio v. Johnson & Johnson*, 2024 WL 693489, at *3 (N.D. Ga. Feb. 20, 2024) (refusing to infer that "any of the sunscreens used by" the plaintiff "were among the samples that contained benzene" absent facts showing "how many samples contained benzene, how many samples were tested, or what product lines or batches contained benzene"); *Krystofiak v. BellRing Brands*, 737 F. Supp. 3d 782, 794 (N.D. Cal. 2024) (declining to extrapolate lead content from a few tested flavors to untested ones); *Barton*, 766 F. Supp. 3d at 1062 (dismissing claims where plaintiffs offered no basis to extrapolate results from one product size to others). The same common-sense principle

applies here: two unverified, context-free numbers cannot support sweeping nationwide allegations against all Casamigos and Don Julio tequila.[15]

In the end, Plaintiffs' 15 causes of action begin and end with those two "test" results. From that meager foundation, they attempt to construct a story of massive deception spanning two brands, numerous product lines, multiple facilities, and hundreds of people, including independent regulators—without a single supporting factual allegation. But conjecture, even dressed in pseudo-scientific language, is still conjecture. Having pled no facts that plausibly establish falsity, Plaintiffs have failed to allege an essential element of every claim and are left with "nothing more than conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

### B. Plaintiffs' Claims Are Barred By Safe Harbors Protecting Conduct That Complies With Federal Law

Plaintiffs' claims under FDUTPA (Count IV), Louisiana Unfair Trade Practices and Consumer Protection Act ("LUPTA") (Count VII), Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA") (Count VIII), California's Consumers Legal Remedies Act ("CLRA") (Count IX), California's False Advertising Law ("FAL") (Count X), California's Unfair Competition Law ("UCL") (Count XI), Colorado Consumer Protection Act ("CCPA") (Count XII), and Georgia's Fair Business Practices Act ("FBPA") (Count XIV), all fail for a separate, dispositive reason: each statute contains a safe harbor provision that protects conduct expressly authorized by law. Because Diageo's '100% agave' labeling complies with binding

---

[15] Plaintiffs' decision to stop at two tests—when additional testing was entirely within their control—speaks volumes. They ask this Court to impute those two dubious results to every Casamigos and Don Julio tequila, yet offer no corroboration of any kind. If their anonymous laboratory truly could "detect[] the adulteration of tequila labeled as 100% agave by identifying the presence of ethanol made from a source other than Blue Weber agave," AC ¶ 58, one would expect at least a handful of consistent results across other bottles or batches. The absence of any such confirmation undermines the plausibility of their allegations and exposes this case for what it is: an attempted money grab based on spurious speculation, not science.

federal regulations and Mexican legal standards incorporated into U.S. law, Plaintiffs' state-law claims are foreclosed.

Each state statute Plaintiffs invoke—like many others nationwide—exempts conduct that conforms to the determinations of federal regulators. The principle is straightforward: state consumer protection laws cannot be used to undermine or relitigate decisions already reviewed and approved by federal agencies. *See Pye v. Fifth Gen.*, 2015 WL 5634600, at *4 (N.D. Fla. Sept. 23, 2015) (dismissing FDUTPA claim under safe harbor provision where vodka label had TTB approval). The same principle applies here.[16]

Diageo's use of "100% agave" fully complies with the interlocking legal/regulatory regimes of Mexico and the United States. As discussed above (*see supra* at 6-9), and in the Amended Complaint, AC ¶¶ 40-51, Mexico closely regulates tequila through a comprehensive set of legal requirements (the NOM) that every tequila producer must follow. The NOM defines 100% agave tequila as "a product whose fermentation may not be enhanced with sugars other than those obtained from the *tequilana weber* blue variety Agave." AC ¶ 42; NOM 5.1.1. To ensure compliance with the NOM, the CRT has "implemented a stringent system of quality control" that "document[s] every single agave planted," involves "an inspector [in] every distillery," and requires every batch of tequila to be tested. *See* Mezcalistas Art; Sainz Decl. ¶¶ 21, 24-26, 31-32,

---

[16] *See* § 501.212(1), Fla. Stat. (FDUTPA does not apply to "[a]n act or practice required or specifically permitted by federal or state law"); Colo. Rev. Code § 6–1–106(1)(a) (CCPA does not apply to "[c]onduct in compliance with the orders or rules of, or a statute administered by, a federal [] agency"); 815 Ill. Comp. Stat. § 505/10b(1) (ICFA does not apply to "[a]ctions or transactions specifically authorized by laws administered by any regulatory body or officer acting under statutory authority"); *Wirth v. Mars Inc.*, 2016 WL 471234, at *6 (C.D. Cal. Feb. 5, 2016) ("Courts have applied the safe harbor doctrine to UCL, FAL, and CLRA claims."), *aff'd*, 730 F. App'x 468 (9th Cir. 2018); *Alvarez v. Chevron Corp.*, 656 F.3d 925, 933-34 (9th Cir. 2011) (applying the safe harbor doctrine to UCL and CLRA claims); Ga. Code Ann. § 10-1-396 (The FBPA does not apply to "actions or transactions specifically authorized under laws administered by or rules and regulations promulgated by any regulatory agency of this state or of the United States").

35-36. Only products that are inspected and approved by the CRT may be labeled as "100% agave." Sainz Decl. ¶¶ 14-15, 41.

The United States, in turn, has recognized tequila as a "distinctive product of Mexico" and enforces Mexico's standards pursuant to the United States–Mexico–Canada Agreement ("USMCA"). Accordingly, federal law prohibits the sale of any product as "Tequila" unless it "has been manufactured in Mexico in accordance with the laws and regulations of Mexico governing the manufacture of Tequila." 27 C.F.R. § 5.148(b); USMCA Art.3.C.2(3). The Treasury Secretary, through the TTB, regulates the importation and labeling of tequila under the Federal Alcohol Administration Act, 27 U.S.C. § 205(e), and its implementing regulations, 27 C.F.R. Part 5. Those regulations prohibit the importation of tequila unless both (1) the CRT has determined it was produced in compliance with the NOM and approved it for export, *see* 27 C.F.R. § 5.30(d); Sainz Decl. ¶¶ 37-42, and (2) the TTB has approved the product's label by issuing a COLA, *see* 27 U.S.C. § 205(e); *see also* 27 C.F.R. §§ 5.25, 5.3. The TTB only grants approval of a label upon making a determination that the submission "complies with applicable laws and regulations." 27 C.F.R. § 13.21(a).[17] In short, the CRT closely regulates tequila production in Mexico and determines whether a tequila satisfies the NOM's definition of "100% agave," and the United States—by law—defers to and adopts that decision when issuing a COLA and permitting importation. AC ¶¶ 40-51. The TTB has issued COLAs to Diageo for both Don Julio and Casamigos tequilas, confirming that they comply with the NOM and U.S. law and authorizing them to be imported and sold in this country as "100% agave" tequila. *See* Exs. 5-6.[18]

---

[17] As part of the COLA process, an importer must certify the "liquor's designation" as tequila made in Mexico in accordance with Mexican law. 27 C.F.R. § 5.148(b)(1).

[18] Courts routinely take judicial notice of COLAs in cases involving representations on alcohol labels. *See, e.g.*, *Jackson v. Anheuser-Busch InBev SA/NV*, 2021 WL 3666312, at *14 n.7 (S.D. Fla. Aug. 18, 2021) (taking judicial notice of COLAs when ruling on motion to dismiss); *Cruz v.*

That federal approval carries binding legal effect. Courts in this Circuit have consistently held that, when an alcoholic beverage label receives federal approval through the TTB, it is entitled to safe harbor protection. *See Jackson*, 2021 WL 3666312, at *14 (safe harbor provision applied because label was approved by "the TTB, a regulator charged with ensuring that the representations on the [product's] label are not misleading") (citation modified); *Pye*, 2015 WL 5634600, at *4 (same). As another court explained, "[t]he Secretary of the Treasury delegated its rulemaking authority to the TTB, which in turn promulgated a series of regulations within the alcoholic-beverage industry. This delegation renders TTB's regulations with the exclusive effect of federal law." *Cruz*, 2015 WL 3561536, at *6. Thus, "receiving COLAs" from the TTB confirms that products "are permitted under federal law" and protects against liability under "the safe harbor doctrine." *Id.* Federal courts applying this principle across the country have reached the same conclusion. *See Jackson*, 2021 WL 3666312, at *14 (COLA approval "sufficient to trigger applicable safe harbor provisions"); *O'Hara v. Diageo-Guinness, USA*, 306 F. Supp. 3d 441, 464 (D. Mass. 2018) (same); *Aliano v. Fifth Generation*, 2015 WL 5675423, at *4 (N.D. Ill. Sept. 24, 2015) (same under Illinois law). In short, when a label receives TTB approval, courts hold that the language is specifically permitted under federal law and therefore protected from claims under state consumer statutes.

The Court should follow Judge Bloom's decision in *Jackson*, rather than the handful of out-of-Circuit cases that question whether a COLA is sufficient to invoke a safe harbor when the disputed statement was never defined or subject to regulatory scrutiny. These decisions are not only not binding, but they rest on reasoning that has no application here. *See, e.g.*, *Kay v. Copper*

---

*Anheuser-Busch*, 2015 WL 3561536, at *4 n.10 (C.D. Cal. June 3, 2015); *Welk v. Beam Suntory Import*, 124 F. Supp. 3d 1039, 1042 (S.D. Cal. 2015) (COLAs approved by TTB "are public records" and are thus "appropriate for judicial notice").

*Cane*, 549 F. Supp. 3d 1014, 1022 (N.D. Cal. 2021) (no evidence that TTB specifically reviewed or verified the challenged label claim); *Aliano v. WhistlePig*, 2015 WL 2399354, at *6 (N.D. Ill. May 18, 2015) (same, where TTB "has not established criteria for evaluating the term" at issue). Diageo's "100% agave" representation is defined by the NOM and subject to rigorous verification by the CRT, which inspects every distillery, tests every batch, and documents each agave plant from field to bottle. *See supra* at 7-9. Because Diageo's labeling complies with this integrated Mexican–U.S. regulatory framework, its conduct falls squarely within the statutory safe harbors.

### C.  The Amended Complaint Is an Impermissible Shotgun Pleading

The Court should dismiss the Amended Complaint for the additional reason that it is a textbook "shotgun pleading." In a transparent attempt to distinguish this case from near-identical actions filed elsewhere, Plaintiffs added two new defendants—Diageo Beer Company USA and Diageo Americas, Inc.—but allege no facts specific to either. AC ¶¶ 33-34. Instead, they lump all three entities together under the interchangeable label "Defendants" or "Diageo" and attribute every act, omission, and alleged misrepresentation to the group collectively. *Id.* ¶¶ 84-314. This pleading tactic plainly violates Rule 8(a)(2), which requires each defendant to receive fair notice of the claims and the grounds upon which they rest. *See Vibe Micro, Inc. v. Shabanets*, 878 F.3d 1291, 1295 (11th Cir. 2018).

The Amended Complaint commits the "sin of asserting multiple claims against multiple defendants without specifying which of the defendants are responsible for which acts or omissions, or which of the defendants the claim is brought against." *Weiland v. Palm Beach Cnty. Sheriff's Off.*, 792 F.3d 1313, 1323 (11th Cir. 2015). Despite spanning more than 60 pages and over 300 paragraphs, it fails to attribute a single factual allegation to any particular entity. Courts have long held that "grouping together" defendants "without differentiation" deprives them of fair notice and requires dismissal. *See Pierson v. Orlando Reg'l Healthcare Sys.*, 619 F. Supp. 2d 1260, 1274

(M.D. Fla. 2009), *aff'd*, 451 F. App'x 862 (11th Cir. 2012). This Court should not be forced to guess which allegations—if any—apply to which Defendant, nor should Defendants be required to do so. *See Worldspan Marine v. Comerica Bank*, 2021 WL 5882006, at *2 (11th Cir. Dec. 13, 2021); *Johnson v. AECOM Energy & Constr.*, 2024 WL 5341716, at *4 (S.D. Fla. May 22, 2024). Because the Amended Complaint "assert[s] multiple claims against multiple defendants without specifying" which defendant is "responsible for which acts or omissions," it violates Rule 8 and must be dismissed. *Barmapov v. Amuial*, 986 F.3d 1321, 1325 (11th Cir. 2021).

### D.  Plaintiffs' Unjust Enrichment Claims Are Duplicative and Legally Deficient

Plaintiffs' unjust-enrichment theories fail for multiple, independent reasons. Because there is no such thing as a nationwide claim for unjust enrichment, *see supra* Section I.B., at most, Plaintiffs have asserted nine separate state-law claims—but each fails as a matter of law.

*First*, the unjust enrichment claims fail because Plaintiffs have not adequately alleged any underlying misrepresentation from which Diageo benefitted. *See supra* Section II.A.

*Second*, several of the states at issue do not recognize unjust enrichment as a standalone cause of action. *See, e.g.*, *Astiana v. Hain Celestial Grp.*, 783 F.3d 753, 762 (9th Cir. 2015) (no independent claim under California law); *Atari Interactive v. State Farm Mut. Auto. Ins.*, 2024 WL 4343050, at *5 (N.D. Tex. Sept. 27, 2024) (same under Texas law); *McClure v. Toyota Motor Corp.*, 759 F. Supp. 3d 1333, 1361 (N.D. Ga. 2024) (in Georgia, "unjust enrichment is not a tort").

*Third*, even where unjust enrichment is recognized, it cannot duplicate statutory claims under Louisiana and Colorado law. *See Complete Logistical Servs. v. Rulh*, 2018 WL 4101823, at *4 (E.D. La. 2018); *Francis v. Mead Johnson & Co.*, 2010 WL 5313540, at *9 (D. Colo. 2010).

*Fourth*, Plaintiffs fail to allege the absence of an adequate legal remedy, a prerequisite for equitable relief in several states, including Florida, Hawaii, and California. *See, e.g.*, *Steel Media v.*

*Lewis*, 2023 WL 1413043, at *11 (S.D. Fla. 2023); *Evans v. Crowe & Mulvey*, 2020 WL 2748484, at *5 (D. Haw. 2020); *Forrett v. Gourmet Nut*, 634 F. Supp. 3d 761, 768 (N.D. Cal. 2022).

*Finally*, Plaintiff Haschemie does not allege that he conferred any *direct* benefit on Diageo, as required under Florida law. He admits that he purchased Diageo tequilas from retailers and restaurants, not from Diageo itself. AC ¶ 11. At most, that establishes an indirect benefit, which is insufficient as a matter of law. *Marrache*, 17 F.4th at 1102.

Because Plaintiffs' unjust enrichment claims are duplicative, improperly pled, and unsupported by the required elements, they should be dismissed in their entirety.

## III.   THE COURT LACKS PERSONAL JURISDICTION OVER THE NON-FLORIDA PLAINTIFFS' CLAIMS

Finally, the claims of the eight non-Florida Plaintiffs (Counts V–XV) must be dismissed for lack of personal jurisdiction. The Amended Complaint identifies no Florida conduct giving rise to their claims and thus fails to establish jurisdiction over Diageo under either Florida's long-arm statute (Section 48.193, Florida Statutes) or the Due Process Clause.

### A.  Florida's Long-Arm Statute Does Not Confer Jurisdiction

To establish personal jurisdiction over Diageo, Plaintiffs must show that Florida's long-arm statute confers jurisdiction and that its exercise comports with due process. *Carmouche v. Tamborlee Mgmt.*, 789 F.3d 1201, 1203-04 (11th Cir. 2015). They have shown neither.

General jurisdiction exists only where a corporation's affiliations with the forum are so "continuous and systematic" as to render it "essentially at home." *Daimler AG v. Bauman*, 571 U.S. 117, 127 (2014). Diageo is not incorporated or headquartered in Florida. *See* AC ¶¶ 29-34. Plaintiffs allege only that Diageo is registered to do business in Florida and sells tequila here— allegations far short of the "exceptional case" required for general jurisdiction. *See Valle v. 3M*, 647 F. Supp. 3d 1262, 1268 (N.D. Fla. 2022); *Waite v. All Acquisition Corp.*, 901 F.3d 1307, 1317-18 (11th Cir. 2018). Courts in this Circuit have repeatedly held that even substantial, continuous

sales in Florida do not make a foreign corporation "at home." *See Goldstein v. Johnson & Johnson*, 2019 WL 289290, at *2 (S.D. Fla. Jan. 21, 2019). Because Florida has not, "for all practical purposes, supplanted [Diageo's] principal place of business (or state of incorporation)," Diageo is not subject to general personal jurisdiction in Florida. *Gilmer v. Bureau Veritas Commodities & Trade*, 2021 WL 3772137, at *3 (S.D. Fla. Apr. 20, 2021) (Gayles, J.).

The Court also lacks specific jurisdiction over the non-Florida Plaintiffs' claims, which must "aris[e] out of or relat[e] to" the defendant's contacts with the forum. *Bristol-Myers Squibb v. Superior Ct. of Cal.*, 582 U.S. 255, 262 (2017). Florida's long-arm statute "only hales defendants into Florida's courts when the plaintiff's cause of action arises from the defendant's purposeful contacts with Florida." *Carter v. Ford Motor Co.*, 2021 WL 1165248, at *6 (S.D. Fla. Mar. 26, 2021). The Amended Complaint alleges none.

The eight non-Florida Plaintiffs live in Hawaii, Louisiana, Illinois, California, Colorado, Texas, Georgia, and Pennsylvania. *See* AC ¶¶ 13-28. They allegedly purchased Diageo's tequilas in those states, claim to have been misled there, and bring statutory and common law claims under those states' laws. Their purported injuries arise entirely from out-of-state conduct—Diageo's activities directed to those jurisdictions—and not from any act occurring in Florida. Nothing in the Amended Complaint connects their purchases or alleged misrepresentations to Florida. As *Carter* explained, Florida's long-arm statute doesn't reach claims where plaintiffs "all live outside of Florida," "bought their [products] outside Florida," and "were (allegedly) defrauded outside Florida." 2021 WL 1165248 at *6. The same is true here. Because the non-Florida Plaintiffs' claims have no Florida nexus, the long-arm statute provides no basis for jurisdiction.[19]

---

[19] Nor can Plaintiffs rely on pendent personal jurisdiction to save their claims. That doctrine "only allows for the addition of *claims*, not parties" lacking any independent jurisdictional basis. *Lewis*, 530 F. Supp. 3d at 1227 n.14. The Eleventh Circuit has never recognized pendent party jurisdiction,

## B.  Exercising Jurisdiction Would Violate Due Process

Even if Florida's long-arm statute could be stretched to reach Plaintiffs' claims—which it cannot—exercising jurisdiction would still violate the Due Process Clause. A corporation is subject to general jurisdiction only where it is "essentially at home," ordinarily its place of incorporation or principal place of business. *Daimler*, 571 U.S. at 137. None of the Diageo entities meets that standard, and Plaintiffs identify no exceptional circumstances suggesting otherwise. *See Meier ex rel. Meier v. Sun Int'l Hotels, Ltd.*, 288 F.3d 1264, 1269 (11th Cir. 2002).

Specific jurisdiction fares no better. Under the Eleventh Circuit's three-part test, Plaintiffs must show that their claims "arise out of or relate to" Diageo's Florida contacts, that Diageo "purposefully availed" itself of this forum, and that jurisdiction would not offend "traditional notions of fair play and substantial justice." *Louis Vuitton Malletier v. Mosseri*, 736 F.3d 1339, 1355 (11th Cir. 2013). The non-Florida Plaintiffs cannot satisfy the first element. Their alleged injuries stem solely from purchases and marketing that occurred outside Florida. A tort "arise[s] out of or relate[s] to" a forum only if the defendant's in-state conduct is the "but-for" cause of the plaintiff's injury. *Waite*, 901 F.3d at 1314. Because no Florida conduct caused these Plaintiffs' alleged harm, exercising jurisdiction would offend due process. *See Steelers Keys v. High Tech Nat'l*, 2020 WL 7197822, at *4 (S.D. Fla. Dec. 7, 2020).

Because the non-Florida Plaintiffs' claims neither arise from nor relate to Diageo's contacts with Florida, the Court should dismiss Counts V through XV for lack of personal jurisdiction.

## CONCLUSION

For the foregoing reasons, the Court should dismiss the Amended Complaint in its entirety pursuant to Rules 8, 9(b), 12(b)(1), 12(b)(2), and 12(b)(6).

---

and district courts in this Circuit have consistently declined to apply it. *See, e.g.*, *Carter*, 2021 WL 1165248, at *8; *Story v. Heartland Payment Sys.*, 461 F. Supp. 3d 1216, 1229-30 (M.D. Fla. 2020).

Dated: October 28, 2025     Respectfully submitted,

/s/ Shane Grannum
GERALD E. GREENBERG
Florida Bar No. 440094
ggreenberg@gsgpa.com
SHANE GRANNUM
Florida Bar No. 1055050
sgrannum@gsgpa.com
E-service: efilings@gsgpa.com

GELBER SCHACHTER & GREENBERG, P.A.
One Southeast Third Avenue, Suite 2600
Miami, FL 33131
Telephone: (305) 728-0950

TIMOTHY S. MARTIN *
tmartin@kaplanmartin.com
CHRISTOPHER R. LE CONEY *
cleconey@kaplanmartin.com
TASHA N. THOMPSON *
tthompson@kaplanmartin.com
PHILIP W. YOUNG *
pyoung@kaplanmartin.com
KAPLAN MARTIN LLP
1133 Avenue of the Americas, Suite 1500
New York, NY 10036
Telephone: (212) 315-9500

* Admitted *pro hac vice*

*Counsel for Defendant Diageo North America, Inc.,*
*Diageo Beer Company USA, and Diageo Americas,*
*Inc.*